PEOPLE v ANDERSON

PEOPLE v STINSON

Docket Nos. 87929, 88635. Submitted November 2, 1987, at Detroit. Decided February 17, 1988. Leave to appeal applied for.

Following a joint jury trial in the Recorder's Court for the City of Detroit, Robert Anderson was convicted of second-degree murder and two counts of assault with intent to do great bodily harm less than murder and John J. Stinson was convicted of second-degree murder. The trial court, Joseph A. Gillis, J., sentenced Anderson to thirty-five to seventy-five years in prison on the murder conviction and two concurrent terms of from six to ten years on the assault convictions. Stinson was sentenced to fifteen to sixty years in prison. The defendants appealed and the Court of Appeals consolidated the appeals.

The Court of Appeals *held:*

1. The defendants were not denied a fair trial or the effective assistance of counsel.

2. The trial court's en masse questioning of potential jurors regarding pretrial media coverage was not error.

3. Any error in regard to the admission of expert testimony, the jury instructions, or comments by the prosecutor was harmless.

---

REFERENCES

Am Jur 2d, Criminal Law §§ 40 *et seq.*; 167, 298, 525 *et seq.*; 688, 689, 712, 945.

Am Jur 2d, Expert and Opinion Evidence §§ 22, 36-44, 90.

Am Jur 2d, Searches and Seizures §§ 16, 43, 45, 99.

Am Jur 2d, Trial §§ 20, 21, 116, 118, 119, 277.

Juror's reading of newspaper account of trial in state criminal case during its progress as grounds for mistrial, new trial, or reversal. 46 ALR4th 11.

Admissibility on issue of sanity of expert opinion based partly on medical, psychological, or hospital reports. 55 ALR3d 551.

Remarks or acts of trial judge criticizing, rebuking, or punishing defense counsel in a criminal case, as requiring new trial or reversal. 62 ALR2d 166.

4. Anderson's sentence does not shock the conscience of the Court of Appeals.

5. The magistrate's determination that Stinson aided and abetted Anderson was not an abuse of discretion.

6. The trial court's decision to leave the determination of intoxication and specific intent to the jury was not an abuse of discretion.

7. The in-court identification of Stinson by two witnesses was based upon a sufficient independent basis so as to purge the taint caused by an alleged prior illegal confrontation.

8. The motion to suppress evidence seized from Stinson's car was properly denied.

9. The joint trial of the defendants was not error.

10. The jury's verdict was not against the great weight of the evidence.

11. The trial court did not err in calculating the sentencing guideline variables.

Affirmed.

1. CRIMINAL LAW — TRIAL — UNFAIR CRITICISM.

A trial court's unfair criticism of defense counsel in front of the jury is always improper; however, reversal is necessary only when the court's conduct denied defendant a fair and impartial trial by unduly influencing the jury.

2. CRIMINAL LAW — EXPERT WITNESSES.

Expert testimony in the form of an opinion is not objectionable because it embraces an ultimate issue to be decided by the trier of fact (MRE 704).

3. CRIMINAL LAW — EXPERT WITNESSES — MENTAL ILLNESS — INSANITY.

An expert may testify regarding the accused's ability to conform his conduct to the demands of the law and may testify that, in his opinion, the defendant was mentally ill or insane when he performed the act in question; an expert may not provide the definition of these legal terms for the jury.

4. CRIMINAL LAW — EXPERT WITNESSES.

An expert witness may base his opinion upon facts perceived by him or made known to him at or before the hearing and may base his opinion upon the findings and opinions of other experts (MRE 703).

5. CRIMINAL LAW — JURY — PRETRIAL PUBLICITY.

Knowledge of publicity concerning a case does not automatically make a prospective juror unfit to serve if that juror does not have a preconceived notion concerning the defendant's guilt or innocence which cannot be set aside.

6. CRIMINAL LAW — APPEAL — PRESERVING QUESTION.

Appellate review is foreclosed where a defendant fails to object to improper remarks by a prosecutor unless the prejudicial effect was so great that it could not have been cured by an appropriate instruction and failure to consider the issue would result in a miscarriage of justice.

7. CRIMINAL LAW — APPEAL — PRELIMINARY EXAMINATIONS.

A magistrate's determination at a preliminary examination whether a crime has been committed and there is probable cause to believe that the defendant committed the crime will not be disturbed on appeal unless there is a clear abuse of discretion.

8. CRIMINAL LAW — AIDING AND ABETTING.

Three elements must be shown to support a finding that a defendant aided and abetted in the commission of a crime: (1) the crime charged was committed either by the defendant or some other person; (2) the defendant performed acts or gave encouragement which aided and assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time of giving aid or encouragement.

9. CRIMINAL LAW — AIDING AND ABETTING.

Mere presence, even with the knowledge that an offense is about to be committed, is not enough to make one an aider or abettor; the defendant must either possess the required intent or participate while knowing that the principal possesses the necessary intent.

10. CRIMINAL LAW — AIDING AND ABETTING.

Planning in advance to provide a felon with a quick getaway is sufficient assistance to find the defendant guilty as an aider and abettor.

11. CRIMINAL LAW — WITNESSES — IDENTIFICATION.

The in-court identification of a defendant will not be allowed where the witness has been exposed to an impermissibly suggestive identification procedure unless the prosecutor shows by clear and convincing evidence that the in-court identification

has a sufficient independent basis so as to purge the taint caused by the illegal confrontation.

12. SEARCHES AND SEIZURES — AUTOMOBILES.

A lawfully stopped automobile may be searched without a warrant where there is probable cause to believe that evidence of a crime will be found therein; an automobile may be seized and searched without a warrant where it is an instrumentality of a crime.

13. CRIMINAL LAW — TRIAL — JOINT TRIALS.

A motion for separate trials must be supported by an affirmative showing of prejudice to the substantial rights of the defendant; severance should be granted whenever the defenses of the codefendants are antagonistic to one another; the decision to hold a joint trial is within the trial court's discretion and will not be reversed absent an abuse of that discretion.

14. CRIMINAL LAW — SENTENCING GUIDELINES.

A trial court's scoring of points for offense variables will be upheld if there is any evidence that supports that scoring, including evidence contained in the preliminary examination record.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief of the Criminal Division Research, Training and Appeals, and *Rosemary A. Gordon,* Assistant Prosecuting Attorney, in *Anderson,* and *Larry L. Roberts,* Assistant Prosecuting Attorney, in *Stinson,* for the people.

*John D. Lazar,* for Robert Anderson.

*George Stone,* for John Stinson.

Before: HOOD, P.J., and R. M. MAHER and J. B. SULLIVAN, JJ.

PER CURIAM. In these consolidated appeals, codefendants Robert Anderson and John J. Stinson challenge their convictions and sentences, which

were received after a joint jury trial held between August 19, 1985, and August 28, 1985. Defendant Anderson was tried on a three-count information alleging murder in the first degree for the death of Diane James, MCL 750.316; MSA 28.548, assault with intent to do greatly bodily harm less than murder upon Curtis McMiller, MCL 750.84; MSA 28.279, and assault with intent to murder Helen James, MCL 750.83; MSA 28.278. The jury returned a verdict of guilty of murder in the second degree for the death of Diane James, MCL 750.317; MSA 28.549, and guilty of assault with intent to do great bodily harm less than murder as to both McMiller and Helen James, MCL 750.84; MSA 28.279. Defendant Anderson was sentenced to serve thirty-five to seventy-five years in prison for the second-degree murder conviction and two concurrent six- to ten-year terms on the assault convictions.

Defendant Stinson was charged with the same offenses on a theory of aiding and abetting and was found guilty of murder in the second degree for the death of Diane James, MCL 750.317; MSA 28.549. He was found not guilty in the assault of McMiller and Helen James. Defendant Stinson was sentenced on September 6, 1985, to fifteen to sixty years in prison. From their convictions and sentences both defendants now appeal as of right alleging numerous errors which allegedly occurred during pretrial, trial, and in the imposition of their sentences.

The charges arose out of an incident occurring in the early morning hours of March 11, 1985. Defendants were driving on Woodward Avenue near Six Mile Road in Detroit. At approximately 3:15 A.M., Helen James was working as a prostitute near the intersection of Collingham and Woodward. She was approached by a gray automo-

bile occupied by two males, whom she identified at both the preliminary examination and at trial as defendants. As she leaned over to speak to Stinson through the window, she was stabbed by Anderson, who had exited from the automobile. He then got back into the car, which sped away. James was able to memorize the automobile's license plate number. The automobile then approached Curtis McMiller, who was walking alone on Woodward. As he crossed the street, he heard a voice coming from the passenger side. He could not understand what was said, and proceeded to cross the street. Then, he heard a car door slam and a voice say, "Are you a boy or a girl?" When he turned towards the voice, he was stabbed in the face by Anderson, who jumped into the automobile, which again sped away. The automobile continued down Woodward, where LaKandra Thomas and Diane James were working as prostitutes. As the two were conversing with defendants, defendant Anderson stabbed James in the chest. James died shortly after being taken to a hospital.

Upon doing a LEIN check on the automobile, the owner was determined to be defendant Stinson. The automobile was discovered at approximately 8:00 A.M. at Warren High School and was impounded and searched by police. Later that evening, an evidence technician from the Detroit Police Department arrived at the Warren Police Department to process the automobile. From the outside of the automobile, the officer saw a knife on the dashboard of the passenger's side and a knife case on the passenger's seat. The officer used a slim jim to open the automobile and did a thorough search, which revealed a Schrade knife with blood on the tip, a knife case, pop and beer bottles, an empty bottle of rum, and a bottle of Rush liquid incense.

That morning, defendants were seen by individuals at Warren High School and were described as apparently drunk, having slurred speech, bloodshot eyes and staggering movements. James Devereaux, a teacher at Warren High School, testified that defendant Anderson came to see him at 12:30 that afternoon and told him that he thought he had killed a black prostitute at Six Mile and Woodward. Pamela Kapp, a friend of defendant Anderson, testified that Anderson told her that evening that he had stabbed some people.

At approximately 3:45 P.M. on March 11, 1985, defendant Stinson, accompanied by his attorney, turned himself in to the Detroit Police Department Homicide Section. On March 13, 1985, Anderson turned himself in.

Defendant Anderson raises nine issues on appeal, and defendant Stinson raises seven. We will address each issue seriatim, discussing Anderson's issues first.

### DEFENDANT ANDERSON'S ISSUES

#### I. WAS DEFENDANT DENIED A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF COUNSEL BY THE CONDUCT OF HIS ATTORNEY AND THE TRIAL JUDGE?

Numerous verbal exchanges occurred between the court and defendant's counsel. Most of these were brief exchanges regarding the court's dissatisfaction with defense counsel's tendency to interrupt witnesses when he didn't like their answers. In the two most serious exchanges, the court ordered defense counsel to sit down, prompting an argument by counsel.

An accused has a right to be represented by an attorney who is treated with the consideration due an officer of the court. Belittling observations aimed at the attorney are necessarily injurious to

the one he represents. *People v Neal,* 290 Mich 123, 129; 287 NW 403 (1939). Trial judges who berate, scold and demean a lawyer, so as to hold him up to contempt in the eyes of the jury, destroy the balance of impartiality necessary to a fair hearing. *People v Wigfall,* 160 Mich App 765, 773; 408 NW2d 551 (1987); *People v Wilson,* 21 Mich App 36, 38; 174 NW2d 914 (1969). While unfair criticism of defense counsel in front of the jury is always improper, reversal is necessary only when the court's conduct denied defendant a fair and impartial trial by unduly influencing the jury. *Wigfall, supra,* p 774.

On the other hand, ideally the judge

> would always discreetly and circumspectly subordinate his opinions and emotions so as to display courtesy and impartiality to counsel and litigants notwithstanding their actions.
>
> It is not always possible; and it does not follow that every deviation from the ideal requires a new trial. Few verdicts would ever stand were that so. Rather, recognizing both human fallibility and the stress of trial, each case is to be reviewed in its entirety to determine whether an atmosphere of prejudice has crept in which may have deprived the appellant of a fair trial. [*People v McIntosh,* 62 Mich App 422, 438-439; 234 NW2d 157 (1975), reversed in part on other grounds 400 Mich 1; 252 NW2d 779 (1977).]

Upon a reading of the record as a whole, we find that reversal is not required. The incidents occurred because defense counsel repeatedly interrupted the witnesses. Defense counsel's behavior was quarrelsome and provoked the court's comments. The court's comments did not belittle and berate counsel, but were responses to counsel's remarks.

Defendant also argues that the disputes between

defense counsel and the court denied him the effective assistance of counsel. After a thorough review of the record, we have determined that defense counsel fought hard and conscientiously to protect his client's interests. Defendant does not contend that counsel made a big mistake but for which the outcome would have been different. Therefore, we conclude that under either *People v Garcia,* 398 Mich 250; 247 NW2d 547 (1976), or *Strickland v Washington,* 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984), defendant was not denied the effective assistance of counsel merely because his attorney engaged in some verbal exchanges with the court.

II. WERE CERTAIN EXPERT WITNESSES ALLOWED TO INVADE THE PROVINCE OF THE COURT BY STATING OPINIONS ON THE LEGAL DEFINITIONS OF MENTAL ILLNESS, INSANITY AND DIMINISHED CAPACITY AND THE LEGISLATURE'S INTENT IN ADOPTING STATUTORY LANGUAGE?

At trial, defendant's defense was insanity, diminished capacity and intoxication. There was testimony that defendant suffered from alcoholism, an organic brain syndrome, and the symptoms of alcohol idiosyncratic intoxification. In addition, there was testimony that defendant had been drinking on the evening of the stabbings. The prosecutor questioned Dr. Rosalind Griffin, defendant's expert witness, and asked her whether a diagnosis of antisocial or substance abuse personality was a mental illness within the legal definition of mental illness. The prosecutor also questioned Dr. George Czertko, an expert for the people, and asked him to explain the legal concept of diminished capacity. Czertko recited in his own words his understanding of diminished capacity. Following objection by defense counsel on the ground

that legal definitions are beyond the expertise of doctors, the court read aloud the statutory definitions of insanity, mental illness and mental retardation.

Expert testimony in the form of an opinion is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. MRE 704. Thus, a psychiatrist or psychologist may testify that a defendant was or was not insane when he performed the act in question. However, an expert's opinion as to the law of criminal responsibility or insanity is of no aid to the jury, and could possibly confuse them. *People v Doan,* 141 Mich App 209, 214; 366 NW2d 593 (1985), lv den 422 Mich 945 (1985); *People v Drossart,* 99 Mich App 66, 76; 297 NW2d 863 (1980), lv den 410 Mich 892 (1981). Based upon the fine distinction made by these two cases, it is clear that an expert may testify regarding the accused's ability to conform his conduct to the demands of the law, and may even testify that, in his opinion, the defendant was mentally ill or insane. However, an expert witness may not provide a definition of these legal terms for the jury.

We do not find Dr. Griffin's testimony objectionable under *Doan,* as it entailed opinion regarding her field of expertise. The testimony of Dr. Czertko is more troublesome, however. By giving his impression of the definition of diminished capacity, he exceeded his expertise. However, we feel the error was harmless. There is no statutory definition of diminished capacity. Rather, diminished capacity is part of the law of insanity. See *People v Mangiapane,* 85 Mich App 379; 271 NW2d 240 (1978); *People v Denton,* 138 Mich App 568; 360 NW2d 245 (1984). Following defendant's objection, the court read aloud the statutory definitions of insanity, mental illness and mental retardation,

which is mandated by MCL 768.29a(1); MSA 28.1052(1)(1). The court also read the legislative provision which states that a person who is under the influence of voluntarily consumed or injected alcohol or controlled substances shall not thereby be presumed insane. In addition, Dr. Czertko stated that a diminished capacity defense applies only to specific intent crimes. Because the jury convicted defendant of second-degree murder, a general intent crime, defendant was not prejudiced by Dr. Czertko's remarks. In light of the court's immediate correction of the error, and because defendant was not prejudiced, we find the error to be harmless.

III. DID ERROR REQUIRING REVERSAL OCCUR WHEN DR. CZERTKO GAVE HIS OPINION BASED UPON HIS REVIEW OF THE REPORTS AND IMPRESSIONS OF OTHER EXPERTS?

Dr. Czertko offered an opinion that defendant was not mentally ill, insane, or suffering from diminished capacity so as to avoid criminal responsibility for his acts. Dr. Czertko based this opinion upon his consultation with the other rebuttal witness, Patricia Wallace, and a review of the report prepared by Wallace and defendant's expert, Dr. Griffin. Defendant claims this was error requiring reversal. We disagree. The cases relied upon by defendant were decided before the adoption of MRE 703, which provides that an expert may base his opinion upon facts perceived by him or made known to him at or before the hearing.

Two recent cases also support the proposition that an expert may base his opinion upon the findings and opinions of other experts. *Swanek v Hutzel Hospital,* 115 Mich App 254, 259-260; 320 NW2d 234 (1982); *Thomas v McPherson Community Health Center,* 155 Mich App 700, 708-709;

400 NW2d 629 (1986). Therefore, we find that the trial court did not abuse its discretion in admitting this testimony.

IV. DID THE TRIAL COURT ERR WHEN, UPON A REQUEST FROM THE JURY FOR REINSTRUCTION ON MENTAL ILLNESS AND INSANITY, IT READ MCL 708.21a(2); MSA 28.1044(1)(2) INSTEAD OF CJI 7:8:02?

Upon request for reinstruction on mental illness and insanity, the trial court gave the standard statutory definitions for mental illness and mental retardation, MCL 330.1400a; MSA 14.800(400a), MCL 330.1500(h); MSA 14.800(500)(h), formerly MCL 330.1500(g); MSA 14.800(500)(g). The court also gave the statutory definition of legal insanity, as set forth in MCL 768.21a; MSA 28.1044(1), which provides:

> (1) A person is legally insane if, as a result of mental illness as defined in section 400a of Act No. 258 of the Public Acts of 1974, being section 330.1400a of the Michigan Compiled Laws, or as a result of mental retardation as defined in section 500(g) of Act No. 258 of the Public Acts of 1974, being section 330.1500 of the Michigan Compiled Laws, that person lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.
> (2) A person who is under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his alleged offense shall not thereby be deemed to have been legally insane.

After this reinstruction defendant's counsel objected, insisting that CJI 7:8:02 be read. This criminal jury instruction, which had been read during the original instruction, includes a second section regarding the voluntary intoxication of the accused, which provides:

(2) However, a person may be mentally ill and intoxicated, with both conditions affecting his actions. It is for you to judge whether, under all of the circumstances, the defendant was mentally ill at the time of the offense, and then to apply the further tests of whether or not the defendant was legally insane. [CJI 7:8:02(2).]

The argument made by counsel at the time of his objection and on appeal appears to be based upon the commentary to CJI 7:8:02 which states that this instruction must be given per MCL 768.29a(1); MSA 28.1052(1)(1). However, a reading of that statute reveals that what must be given are instructions regarding the statutory definitions of mental illness, mental retardation, insanity and voluntary intoxication, with citations to the very statutes read by the court. Thus, the court did precisely what was required of it. In addition, the use of the CJIS is not required, and this Court and the Supreme Court have warned trial courts to examine them carefully before using them to ensure their accuracy and appropriateness to the case at hand. *People v Petrella,* 424 Mich 221, 277; 380 NW2d 11 (1985).

V. WAS DEFENDANT DENIED A FAIR TRIAL WHEN THE COURT QUESTIONED THE JURORS AS A GROUP WHETHER THEY WERE INFLUENCED BY PRETRIAL MEDIA COVERAGE, RATHER THAN ASKING EACH JUROR INDIVIDUALLY?

At trial, the court conducted the voir dire with the input of counsel. The judge asked the potential jurors whether any of them had heard or read anything about the case before trial. After eight jurors raised their hands, the court asked them whether they would be influenced by this information. No one raised a hand. Defense counsel then requested that the court question each of those

jurors individually. The court declined to do so, stating that asking the jurors as a group was sufficient to ensure the absence of bias. The court further asked the jurors whether any of them had made up their minds as to the guilt or innocence of defendants based upon what they had read, seen or heard. There was no affirmative response to this question either. At the conclusion of voir dire, defense counsel had exercised fifteen peremptory challenges and expressed his satisfaction with the jury empaneled.

Defendant now claims that he was prejudiced by the court's failure to question individually those jurors who indicated that they had heard or read something about the case prior to trial. We disagree.

The trial judge is properly permitted to conduct voir dire and to determine whether a juror is biased. He is entitled to broad discretion in his examination of potential jurors. The court's determination of a juror's ability to render an impartial verdict is reversed by this Court only where we find a clear abuse of discretion. *People v Johnson,* 103 Mich App 825, 830; 303 NW2d 908 (1981), lv den 417 Mich 962 (1983).

Although it is indisputable that a criminal defendant is entitled to a fair trial by an impartial jury, defendant does not provide support for the proposition that jury impartiality can only be determined through individual questioning of the prospective jurors. The only case which mandated individual questioning of jurors is *Coppedge v United States,* 106 US App DC 275; 272 F2d 504 (1959), which involved significantly different facts than the instant case. In *Coppedge,* the jurors, who had already been empaneled and were in the process of hearing the evidence, were exposed to newspaper articles regarding the trial which con-

tained information which the court and the parties sought to have excluded from them. The court reminded the jurors of their responsibility not to consider any outside information before asking them en masse whether they were influenced by their exposure to this information. On these facts, the appellate court held that there was no assurance that those jurors were in fact unaffected by the articles.

In contrast, the articles about which defendant in the instant case expresses his concern appeared in the newspapers at the time of the incident, some five months prior to the trial. The prospective jurors had not been empaneled as had the jurors in *Coppedge.* In addition, they had not been cautioned by the court prior to the en masse questioning that they should not have considered any outside information, which made the *Coppedge* jurors more likely to deny any influence.

Knowledge of publicity concerning a case does not automatically make a prospective juror unfit to serve, if that juror does not have a preconceived notion concerning the defendant's guilt or innocence which cannot be set aside. *People v Jancar,* 140 Mich App 222, 231; 363 NW2d 455 (1985); *People v Dixon,* 84 Mich App 675, 680; 270 NW2d 488 (1978), lv den 405 Mich 837 (1979); MCL 768.10; MSA 28.1033. Upon being questioned by the trial judge, the jurors in the instant case indicated that nothing they had heard or seen had caused them to make up their minds regarding the guilt or innocence of defendants.

Even if we were to find the trial court erred in not questioning the jurors individually, defendant waived this issue when he failed to exercise all of his available peremptory challenges and when he expressed his satisfaction with the jury. *People v*

*Tubbs,* 22 Mich App 549, 561; 177 NW2d 622 (1970).

VI. DID THE PROSECUTOR'S QUESTIONS REGARDING THE SIGNIFICANCE OF THE VICTIMS' RACE AND HIS CLOSING ARGUMENT EMPHASIZING REGIONAL DIFFERENCES BETWEEN THE JURORS AND DEFENDANTS CONSTITUTE PROSECUTORIAL MISCONDUCT WHICH DENIED DEFENDANT A FAIR TRIAL?

Defendant alleges numerous incidents of prosecutorial misconduct which he claims were designed to inflame and prejudice the jury and cause them to suspend their own powers of judgment. The first such misconduct involved questions which the prosecutor posed the expert witnesses regarding the racial identity of the victims. The prosecutor questioned defendant's expert, Dr. Griffin, whether the fact that the victims were black and either prostitutes or effeminate indicated any pattern of organized behavior on the part of defendant. He then posed a similar question to Dr. Wallace, an expert for the people. Upon reading the entire transcript in this case, it is our opinion that the prosecutor's questions were not designed to inject any racial bias into the trial, but, rather, were relevant questions designed to demonstrate defendant's intent and unimpaired capacity.

Defendant also challenges the prosecutor's references in closing argument to the fact that defendants came from the suburbs to hurt residents of Detroit. However, defendant did not object to any of these remarks. When the defendant fails to object to improper remarks made by the prosecutor, appellate review is foreclosed unless the prejudicial effect was so great that it could not have been cured by an appropriate instruction and failure to consider the issue would result in a miscarriage of justice. *People v Federico,* 146 Mich

App 776, 794; 381 NW2d 819 (1985), lv den 425 Mich 867 (1986). A determination of whether prosecutorial comments are improper depends upon a reading of the comments in context. *People v Duncan,* 402 Mich 1, 16; 260 NW2d 58 (1977). Although we find the prosecutor overstepped his bounds when he argued that people from the suburbs should not be able to come into the city and hurt its residents, we feel that in light of the lack of objection reversal is not required.

> In considering the likely effect of a prosecutor's argument on the verdict, the improper statements must be evaluated in light of their relationship to the evidence adduced at trial. Each case must be considered on its own facts. An improper argument harmless in one case may be reversible in another. See *People v Cowell,* 44 Mich App 623, 627-628; 205 NW2d 600 (1973). [*People v Leverette,* 112 Mich App 142, 152; 315 NW2d 876 (1982).]

> The harmless error standard applicable to this type of problem requires us to reverse if the error was so offensive to the maintenance of the judicial system that it can never be deemed harmless or if, in a trial free of the error, one juror might have voted to acquit. *People v Swan,* 56 Mich App 22, 31-33; 223 NW2d 346 (1974), lv den 395 Mich 810 (1975). [*Id.,* p 151.]

Because of the overwhelming evidence against defendants, we feel the error was harmless. We feel that a juror would not likely vote to acquit had the remarks not been made. In addition, upon a review of the prosecutor's comments in their context, we conclude that they were not so egregious that an instruction following a proper objection would not have cured them.

VII. WAS THE COURT'S INSTRUCTION THAT DEFEN-

DANT COULD BE FOUND GUILTY OF ASSAULT WITH
INTENT TO COMMIT MURDER IF THE DEATH OF HELEN
JAMES WOULD HAVE MADE THE OFFENSE EITHER
FIRST- OR SECOND-DEGREE MURDER ERRONEOUS AND
PREJUDICIAL TO DEFENDANT?

Defendant did not object to the jury instructions.
Where no objection was raised to the court's in-
structions, the jury's verdict will not be set aside
absent manifest injustice *People v Vicuna,* 141
Mich App 486, 494; 367 NW2d 887 (1985). Al-
though a case cited by defendant, *People v Taylor,*
422 Mich 554, 567; 375 NW2d 1 (1985), states that
a specific intent to kill must be present in order to
convict of assault with intent to murder, in con-
trast to a murder conviction which can be sup-
ported by the intent to inflict great bodily harm or
a wilful disregard of the likelihood of death or
great bodily harm, *Taylor* is not directly on point
since this Court noted that the jury was at no time
instructed that the specific intent to kill was nec-
essary. *Taylor, supra,* p 568.

In contrast, the court in the case at bar properly
instructed the jury that defendants must have
intended to kill Helen James under circumstances
that did not justify, excuse or mitigate the crime.
Furthermore, the corrective action taken by the
Court in *Taylor* was a remand for entry of a
judgment of guilty of assault with intent to do
greatly bodily harm less than murder, MCL
750.84; MSA 28.279, which was the verdict ren-
dered in the case at bar. Therefore, if the court
committed error in its instruction, the error was
harmless.

VIII. WAS DEFENDANT DENIED A FAIR TRIAL BY THE
CUMULATIVE EFFECT OF THE VARIOUS ERRORS NOTED
ABOVE?

Although one error in a case may not necessar-

ily provide a basis for reversal, it is possible that the cumulative effect of a number of minor errors may add up to error requiring reversal. *People v Morris*, 139 Mich App 550, 563; 362 NW2d 830 (1984). However, since we have found no palpable error on any one issue, we are incapable of finding a cumulative effect of several errors. *Id.*

IX. DOES DEFENDANT'S SENTENCE OF THIRTY-FIVE TO SEVENTY-FIVE YEARS FOR SECOND-DEGREE MURDER SHOCK THE CONSCIENCE OF THIS COURT?

At defendant's sentencing, his attorney noted on the record that he had reviewed the presentence report with defendant and found it to be factually accurate. In addition, he requested the court to consider defendant's alcohol problem in setting the sentence, along with his otherwise exemplary behavior. Defendant was given an opportunity for allocution. The court articulated on the record the reasons for the sentence it imposed, and the sentence fell within the sentencing guidelines. In stating its reasons for the sentence imposed, the court mentioned the deterrent effect of the sentence and suggested that punishment was also a motive. Furthermore, the court highlighted the fact that its sentence was within the sentencing guidelines. Although the sentence is a severe one, the crime committed was heinous. The sentence does not shock our conscience.

DEFENDANT STINSON'S ISSUES

I. WAS THERE SUFFICIENT EVIDENCE PRESENTED AT THE PRELIMINARY EXAMINATION TO ESTABLISH THAT A CRIME HAD BEEN COMMITTED AND THAT THERE WAS PROBABLE CAUSE TO BELIEVE THAT DEFENDANT HAD AIDED AND ABETTED THE COMMISSION OF THE CRIME?

At the preliminary examination, the magistrate must determine whether a crime has been committed and whether there is probable cause to believe that defendant committed the crime. MCL 766.13; MSA 28.931. The prosecutor must offer evidence as to each element of the offense, but is not required to prove the elements of the crime beyond a reasonable doubt. *People v Martin,* 150 Mich App 630, 634; 389 NW2d 713 (1986). This Court will not disturb the magistrate's determination at the preliminary examination unless there is a clear abuse of discretion. *Id.*

In the case at bar, defendant Stinson was charged in multiple counts as an aider and abettor. To show that one has aided and abetted a crime requires proof (1) that the crime charged was committed either by the defendant or by some other person, (2) that the defendant performed acts or gave encouragement which aided and assisted in the commission of the crime, and (3) that the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time of giving the aid or encouragement. *People v Acosta,* 153 Mich App 504, 512; 396 NW2d 463 (1986), lv den 428 Mich 865 (1987). Mere presence, even with the knowledge that an offense is about to be committed, is not enough to make one an aider or abettor. The defendant must either possess the required intent or participate while knowing that the principal possesses the necessary intent. *People v Eggleston,* 149 Mich App 665, 668; 386 NW2d 637 (1986), lv den 425 Mich 862 (1986).

Planning in advance to provide a felon with a quick getaway is sufficient assistance to find the defendant guilty as an aider and abettor. *People v Hartford,* 159 Mich App 295, 302; 406 NW2d 276 (1987). Furthermore, evidence from which it could

reasonably be inferred that the defendant knowingly acted as the driver of a getaway car is sufficient to support the magistrate's bindover as an aider and abettor. *Martin, supra,* p 635.

Although defendant correctly states that mere presence at the scene of a felony cannot create a jury question of aiding and abetting second-degree murder, other factors such as a close association between the defendant and the principal actor, his participation in planning or executing the crime, and evidence of flight after the crime could be considered in determining whether there was sufficient evidence that he acted in concert with the principal. *People v Trudeau,* 51 Mich App 766, 772-73; 216 NW2d 450 (1974), lv den 391 Mich 839 (1974), cert den 419 US 868 (1974).

In the preliminary examination the following evidence was presented which tended to show that Stinson aided or assisted in the assaults upon the various victims and that he either intended the acts committed by defendant Anderson or knew of defendant Anderson's intentions: Stinson was the owner and driver of the gray 1978 Dodge Magnum which was positively identified through its license plate number by two eyewitnesses. Stinson was seen earlier in the evening of March 10, 1985, along with defendant Anderson and the two indicated that they planned to go downtown to Carl Ramey's Bar. Curtis McMiller identified defendant Anderson and indicated that he was the individual who slashed his face and that Anderson had been the passenger in the gray car; Helen James identified both defendants at the preliminary examination although she had been unable to identify defendant Stinson in a photo spread shown to her after the incident. James did indicate that she looked at the driver and that she was talking with him when defendant Anderson stabbed her. After

James was stabbed, the car sat there for a few minutes and then drove off through the alley with the lights off. LaKandra Thomas testified that defendant Stinson did most of the talking when she and Diane James encountered the men, and after Diane James was stabbed the car sped away.

Additionally, through the witnesses came evidence that each of these three incidents occurred within approximately one hour, and along an approximately one mile course from south to north along Woodward Avenue. Based upon the evidence presented at the preliminary examination, we cannot conclude that the magistrate's determination that there was probable cause to believe that defendant Stinson aided and abetted defendant Anderson in the commission of these crimes was an abuse of discretion.

## II. IN LIGHT OF THE EVIDENCE OF INTOXICATION, WAS THERE SUFFICIENT EVIDENCE TO ALLOW THE FIRST-DEGREE MURDER CHARGE TO GO TO THE JURY?

Defendant argues that there was insufficient evidence to send the first-degree murder charge to the jury because of evidence of intoxication, which is a defense to first-degree murder, a specific-intent crime. We do not agree.

A jury should not be permitted to consider any charge unwarranted by the proofs. In such a case, there is always prejudice because a defendant's chances of acquittal on a valid charge is substantially decreased by the possibility of a compromise verdict. *People v Vail,* 393 Mich 460, 464; 227 NW2d 535 (1975). Voluntary intoxication can be a defense to first-degree murder, which is a crime requiring specific intent. *Garcia, supra,* p 259. What does not necessarily follow, however, is that any evidence of intoxication is sufficient to defeat probable cause to believe that defendant commit-

ted an act requiring specific intent. The only evidence presented regarding intoxication in the instant case was the following: Defendant Stinson shared a drink with three friends at around 6:00 P.M. on the night in question. The drink consisted of thirty-two ounces of Coke and a portion of a half-gallon bottle of rum. At 7:30 P.M. both defendants were together and neither was intoxicated. At 10:30 P.M. the next night, defendant's car was searched and the bottle of Barcardi rum was found to be empty. Eyewitnesses to the stabbings indicated that they could smell alcohol on defendant Anderson's breath. Eyewitness testimony was conflicting whether defendant Anderson acted drunk or under the influence.

There was not overwhelming evidence that either or both defendants were intoxicated at the time the incident occurred. A reasonable inference could be made that either or both defendants, either alone or with help, consumed the rum some time after the incident and before the car was searched the following night. Therefore, we do not believe that the trial court abused its discretion when it decided to leave the determination of intoxication and specific intent to the jury.

### III. WAS THE TRIAL COURT'S REFUSAL TO SUPPRESS THE IN-COURT IDENTIFICATION OF DEFENDANT ERROR REQUIRING REVERSAL?

Defendant argues that the in-court identification of defendant should be suppressed because two witnesses were unable to identify him at a photographic showup, and because the witnesses who identified defendant at trial saw defendant brought from custody into the courtroom with defendant Anderson at an adjourned preliminary examination. Defendant argues that this first appearance of defendant was improperly suggestive

and that the witnesses' in-court identification should therefore have been suppressed.

When a witness has been exposed to an impermissibly suggestive identification procedure, the in-court identification of the defendant will not be allowed unless the prosecutor shows by clear and convincing evidence that the in-court identification has been based upon a sufficient independent basis so as to purge the taint caused by the illegal confrontation. *People v Kachar,* 400 Mich 78, 95-97; 252 NW2d 807 (1977). The factors to be considered when determining whether the in-court identification has an independent basis are listed in *Kachar* at pages 95-96.

We feel that a sufficient independent basis existed in the instant case. At the preliminary examination, Helen James testified that just before she was stabbed she bent down and stuck her head inside the car to talk with the driver. At that time she said she was looking at the driver. Thomas testified that she and Diane James went to the driver's side of the car and Diane talked with the driver. Although a close question, we feel that there was a sufficient independent basis for the witnesses' identification. Even if there was not a sufficient independent basis, reversal is not required as there was sufficient circumstantial evidence to convict defendant. *Leverette, supra,* p 155.

IV. SHOULD THE EVIDENCE SEIZED FROM DEFENDANT'S CAR HAVE BEEN SUPPRESSED AS HAVING BEEN OBTAINED THROUGH AN ILLEGAL SEARCH WITHOUT A WARRANT?

Under the Fourth Amendment of the federal constitution, an automobile may be searched without a warrant when there is probable cause to believe that evidence of a crime will be found in a

lawfully stopped automobile. *United States v Ross,* 456 US 798; 102 S Ct 2157; 72 L Ed 2d 572 (1982); *People v Futrell,* 125 Mich App 568, 572; 336 NW2d 834 (1983). There is no clear indication that the state constitution provides any greater protection. *People v Davis,* 133 Mich App 707, 717; 350 NW2d 796 (1984), lv den 424 Mich 886 (1986). In addition, when an automobile is an instrumentality of the crime it may lawfully be seized and searched without a warrant. *People v Sorrell,* 139 Mich App 707, 709-710; 363 NW2d 18 (1984); *People v Cook,* 24 Mich App 401, 407; 180 NW2d 354 (1970), lv den 384 Mich 805 (1971).

It is undisputed that two witnesses gave a description of the vehicle in question and provided police with the same license plate number. The automobile matching that description and bearing that license plate number was found at Warren High School at approximately 8:00 A.M. on the morning of March 11, 1985. That afternoon the car was impounded by the Warren Police Department. Prior to the time that the car was actually entered and searched, the evidence technician saw a knife on the passenger side of the dashboard, a knife case on the passenger's seat, and bottles on the floor. At the time that the car was impounded, defendants were still at large.

On the facts, we conclude that the officers had probable cause to search the vehicle, since it matched in physical description the vehicle used by defendants and had the same license plate number. Furthermore, since defendants were still at large there also appeared to be exigent circumstances.

Finally, since the vehicle was used to transport defendants during the perpetration of the crime and to provide the escape for defendants after the crime, it also appears to have been an instrumen-

tality of the crime itself. On the facts, the search conducted in this case was very similar to that conducted in *Cook, supra,* where an eyewitness to a kidnapping provided the police with a license plate number and description which the police traced to the defendant. Upon finding the vehicle matching the description in the defendant's open garage, the police impounded the car and later searched it. This Court upheld the denial of the defendant's motion to quash because the car itself was an instrumentality of the crime placed in plain view. *Cook, supra,* pp 406-407.

V. SHOULD THE TRIAL COURT HAVE GRANTED DEFENDANT A SEPARATE TRIAL WHEN THE ISSUE WAS RAISED BY DEFENDANT IN RELATION TO THE STATEMENTS MADE BY CODEFENDANT ANDERSON AND IT WAS AGREED THAT THOSE STATEMENTS WOULD BE ADMITTED WITHOUT ANY REFERENCE TO DEFENDANT?

One of defendant's pretrial motions was to either sever the trials of Anderson and Stinson or delete the statements made by defendant Anderson to Devereaux which referred to defendant Stinson. After some discussion by counsel and the court of the alternative ways of dealing with the problem, the court decided to proceed with a consolidated trial with a single jury and with care taken to eliminate mention of defendant Stinson from the statements made by defendant Anderson. Defendant Stinson's counsel expressed his satisfaction with this resolution and did not object further to the joint trial of the two defendants.

There is a strong policy favoring joint trials in the interest of justice, judicial economy and administration. Defendants do not have an absolute right to separate trials. *People v Byrd,* 133 Mich App 767, 776; 350 NW2d 802 (1984), lv den 419 Mich 960 (1984). A decision to hold a joint trial is within

the trial court's discretion and will not be reversed absent an abuse of that discretion. *Id.; People v Moscara,* 140 Mich App 316, 318; 364 NW2d 318 (1985). A motion for separate trials must be supported by an affirmative showing of prejudice to the substantial rights of the defendant. *Id.* Severance should be granted whenever the defenses of the codefendants are antagonistic to one another. *People v Hurst,* 396 Mich 1, 6; 238 NW2d 6 (1976). In the instant case, defendant did not file any affidavits stating that defendants' defenses were antagonistic. He filed no affidavits and made no argument that his substantial rights would be prejudiced by a joint trial. Defendant's only reason for severance was because of Anderson's statements to Devereaux in which he mentioned defendant; however, defense counsel agreed to the remedy of removing references to Stinson. Since defendants' defenses and theories were not antagonistic, and since we do not agree that the circumstances of this case are sufficient to deprive defendant Stinson of a fair trial, the trial court's failure to sua sponte order a severance was not an abuse of discretion.

VI. WAS THE JURY'S VERDICT AGAINST THE GREAT WEIGHT OF THE EVIDENCE AND WAS THE CONDUCT OF THE TRIAL JUDGE AND COCOUNSEL SUCH THAT DEFENDANT WAS DENIED A FAIR TRIAL?

We have reviewed all the evidence and conclude that, taking the evidence in a light most favorable to the prosecution, a rational trier of fact could find the elements of the crime proven beyond a reasonable doubt. *People v Hampton,* 407 Mich 354; 368; 285 NW2d 284 (1979). The misconduct alleged by defendant Stinson does not warrant reversal, as we have already held that it did not warrant reversal of Anderson's conviction.

VII. IS DEFENDANT ENTITLED TO RESENTENCING BECAUSE THE TRIAL COURT'S CALCULATION OF THE SENTENCING GUIDELINE VARIABLES WAS NOT SUPPORTED BY THE EVIDENCE?

The trial court's scoring of points for offense variables will be upheld if there is any evidence that supports that scoring, including evidence contained in the preliminary examination record. *People v Green,* 152 Mich App 16, 18; 391 NW2d 507 (1986), lv den 426 Mich 859 (1986). Upon a review of all the evidence in the instant case and the court's scoring of the variables, we conclude that there was evidence to support all of the numbers the trial court gave to the various offense variables.

Since we have found no error requiring reversal, the convictions and sentences of both defendants are affirmed.

Affirmed.